**Claude CIMINO, et al.**

v.

**RAYMARK INDUSTRIES, INC., et al.**

**Civ. A. No. B–86–0456–CA.**

United States District Court,
E.D. Texas,
Beaumont Division.

June 18, 1990.

Walter Umphrey, Diane Dwight, Greg Thompson, Umphrey, Swearingen, Eddins & Carver, Wayne Reaud, Joe Blanks, Reaud, Morgan, and Quinn, Beaumont, Tex., and Ron Motley, Ness, Motley, Loadholt, Richardson & Poole, Charleston, S.C., for plaintiffs.

Elizabeth Thompson, Butler & Binion, Houston, Tex., for Carey Canada, Inc.

Robert S. Daggett, Gary Fergus, Brobeck, Phleger & Harrison, San Francisco, Cal. and R. Lyn Stevens, Weller, Wheelus & Green, Beaumont, Tex., for Fibreboard Corp.

Henry Garrard, III, Bill Harvard, Blasingame, Burch, Garrard & Bryant, P.C., Athens, Ga. and Robert Fanning, and Phil Brown, Fanning, Harper & Martinson, Dallas, Tex., for Pittsburgh–Corning.

Robert Arredondo, Butler & Binion, Houston, Tex., for Celotex Corp.

Michael Baker, Strong, Pipken, Nelson & Bissell, Beaumont, Tex., for Asbestos Corp. Ltd.

### MEMORANDUM OPINION AND ORDER

ROBERT M. PARKER, Chief Judge.

## I. INTRODUCTION

This case involves the claims of 2,336 Plaintiffs, all alleging that they contracted a disease or injury as a result of exposure to the Defendants' asbestos-containing products while employed at a number of refineries and other worksites in the Beaumont–Port Arthur–Orange area. The case proceeded to trial as a class action on the issues of liability and punitive damages with regard to the claims of the 2,336 class members. In addition, the jury determined the complete cases of ten class representatives.

After an eight week trial, the jury found for the Plaintiffs and awarded nine of the class representatives approximately $3.5 million in actual damages. The jury found the Defendants grossly negligent and assessed, as punitive damages, a multiplier (for each $1.00 of actual damages incurred by class members) against each one of the Defendants. The multipliers ranged from $1.50 to $3.00.

After the conclusion of trial, this Court invited submission of authorities and argument on the following matters under consideration:

1. Whether the jury's answers to Special Interrogatories 2, 3, and 4 are surplusage.
2. The significance, if any, of the jury's answer to Special Interrogatory 6.
3. Whether there is a basis in the record for a contributory negligence finding on certain individual plaintiffs other than smoking.
4. The proper date to be utilized and procedure for calculating prejudgment interest on individual plaintiff cases.
5. The effect of prior settlements in calculating the punitive damage multiplier.

*See* Court's April 10, 1990 *Order.* The Court subsequently held a hearing on April 27, 1990, and received briefs from the parties on the above issues. This Memorandum Opinion and Order will discuss the issues individually and will, then, focus on other matters under consideration by the Court.

## II. INTERROGATORIES 2, 3, and 4

■ In answer to Special Interrogatory 1, the jury found that Defendants Carey Canada, Celotex, and Fibreboard knew or should have known as early as 1935 that insulators were at risk of getting an asbestos-related injury or disease from the application, use or removal of Defendants' asbestos-containing insulation products. The jury found that Pittsburgh Corning knew or should have known as early as 1962 that insulators were at such a risk.

In answer to Special Interrogatory 2, the jury found that all four of the above Defendants knew or should have known as early as 1965 that household members of insulators were at such a risk.

The jury found, in answer to Special Interrogatory 3, that Carey Canada, Celotex, and Fibreboard knew as early as 1955 that crafts working with or near insulation products were at such a risk. With regard to the same question, the jury found the relevant date for Defendant Pittsburgh Corning Corporation to be 1962.

The jury found, in answer to Interrogatory 4, that all four Defendants knew or should have known as early as 1965 that household members of crafts working with or near insulation products were at risk of getting an asbestos-related injury or disease from the application, use or removal of Defendants' asbestos-containing insulation products.

Finally, in answer to Special Interrogatory 5, the jury found that all of the asbestos-containing insulation products of each of the four Defendants were defective as marketed and unreasonably dangerous at all times the products were sold after the date found in answer to Interrogatory 1.

A manufacturer or seller of a product has a duty to warn users or consumers of dangers in the use of the product that are reasonably foreseeable at the time the product is sold. *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1088 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). The duty to warn attaches whenever a reasonable man would want to be informed of the risk in order to decide whether to expose himself to it. *Id.* at 1089. Moreover, a warning is intended to be adequate for the "average user" of the product; the adequacy of the warning must be evaluated together with the knowledge of the ultimate users of the product. *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir.1984).

In its answer to Special Interrogatory 1, the jury implicitly found that it was foreseeable to the Defendants as early as 1935 (1962 for Pittsburgh Corning) that human beings exposed to the Defendants' asbestos

products were at risk of contracting an asbestos-related injury or disease. This Court finds, as a matter of law, that the Defendants had a duty at that time to inform all asbestos users and their household members of the dangers associated with exposure to the Defendants' asbestos-containing products. The jury's answers to Special Interrogatories 2, 3, and 4 are, therefore, immaterial and shall be disregarded.

## III. THE JURY'S ANSWER TO SPECIAL INTERROGATORY 6

In answer to Special Interrogatory 6, the jury found that Carey Canada had actual knowledge that the raw asbestos it supplied to Celotex and Eagle–Picher was being made into insulation products and sold by such companies without an adequate warning. The evidence in the record shows that Carey Canada was a major supplier of raw asbestos to Celotex and Eagle–Picher Industries and that these two intermediaries used Carey Canada's raw asbestos to make insulation products. Eagle–Picher's and Celotex's insulation products were then sold to the worksites where the class representatives received their asbestos exposure. The record is unclear, however, how much of the insulation products, if any, containing Carey Canada's raw asbestos were subsequently sold by Celotex and Eagle–Picher to the worksites where the class representatives received their asbestos exposure.

Carey Canada contends that it is entitled to rely on the specialized knowledge of its immediate purchaser in determining whether a warning was required for its products. Carey Canada argues further that, if Eagle–Picher and Celotex were or should have been aware of the dangerous propensities of asbestos, then Carey Canada was not required to warn consumers or users of those propensities.

■ Under Texas law,

... a manufacturer or supplier may, in certain situations, depend on an intermediary to communicate a warning to the ultimate user of a product. However, the mere presence of an intermediary

does not excuse the manufacturer from warning those whom it should reasonably expect to be endangered by the use of its product. The issue in every case is whether the original manufacturer has a reasonable assurance that its warning will reach those endangered by the use of its product.

*Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 591 (Tex.1986) (*Alm* I). The Supreme Court of Texas has made it clear that the very fact that a bulk supplier has warned its intermediary does not relieve the supplier of liability for damages caused by the finished product:

Some courts have also held that a bulk supplier, one who sells a product to another manufacturer or distributor who in turn packages and sells the product to the public, need only warn its intermediate distributor and not each individual consumer ... [b]ut ... the issue is whether the supplier's reliance on the intermediary is reasonable.

*Alm*, 717 S.W.2d at 592. The court outlined three factors in assessing whether the supplier's reliance is reasonable:

In determining whether a bulk supplier's duty to warn extends to ultimate users of a product, courts may consider whether the distributor is adequately trained, whether the distributor is familiar with the properties of the product and its safe use, and whether the distributor is capable of passing on its knowledge to consumers.

*Alm*, 717 S.W.2d at 592.

In this action, then, the real issue is whether Carey Canada reasonably relied on Eagle–Picher and Celotex to pass on to users warnings concerning the dangers of asbestos. To make this determination, it was necessary to know whether Eagle–Picher and Celotex were capable of passing on such warnings to users of asbestos products and, if not, whether Carey Canada knew about this incapacity. In answering Special Interrogatory 6, the jury implicitly found that Eagle–Picher and Celotex were incapable of passing on warnings concerning the dangers of asbestos.

■ Clearly, Texas law in conjunction with the jury's answer to Special Interrogatory 6 impose liability on Carey Canada for any damages incurred by the Plaintiffs from their exposure to asbestos. The Plaintiffs have failed to prove, however, exposure to Carey Canada's products. As Carey Canada was a major supplier of raw asbestos to Eagle–Picher and Celotex, any liability of Carey Canada is derivative of the liability of Eagle–Picher and Celotex. The Plaintiffs have failed to quantify the extent that Carey Canada's raw asbestos was integrated into the products of Eagle–Picher and Celotex to which the class representatives were exposed. In addition, from the evidence in the record, it is apparent that the Plaintiffs will not be able to make such a showing with regard to the exposure of the remaining Plaintiffs in this action.

The jury found that four of the class representatives were exposed to a product sold by Carey Canada. At trial, the Plaintiffs introduced testimony concerning a number of the Plaintiffs' exposure to a product referred to as "blue mud." Carey Canada sold a product called "blue mud" and labelled 7M–90. However, the record shows that a number of the other Defendants also sold "blue mud." This Court finds that there is no evidence in the record to support the jury's findings distinguishing Carey Canada's "blue mud" from other suppliers' "blue mud." It is not possible then, from the evidence presented in this case, to determine whether the Plaintiffs were exposed to Carey Canada's "blue mud" (7M–90) or the "blue mud" of another Defendant. The Plaintiffs have failed to provide evidence showing that they will be able to demonstrate that any of the remaining Plaintiffs were exposed to Carey Canada's 7M–90. From the foregoing, the Court ORDERS that the Plaintiffs' claims against Carey Canada for compensatory damages, with regard to the class representatives as well as the remaining Plaintiffs in this action, are dismissed with prejudice.

The Court finds that there is sufficient evidence in the record to support a punitive damage award against Carey Canada. The Court is aware that, under Texas law, proof of actual damages is a prerequisite to recovery of punitive damages. *See Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 745 (Tex.1986); *Nabours v. Longview Sav. & Loan Ass'n.*, 700 S.W.2d 901, 903 (Tex.1985), and *Gill Savings Ass'n. v. Chair King, Inc.*, 783 S.W.2d 674, 680 (Tex.App.—Houston [14th Dist.] 1989, no writ). The Court is also aware that Texas is a proportionality state. In Texas, punitive damages must bear a reasonable proportion to actual damages. *See Nabours v. Longview Sav. and Loan Ass'n.*, 700 S.W.2d at 901 and *Alamo National Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981). Nevertheless, the Court finds that, under the circumstances of this action, Texas courts would carve out an exception to the general rule and allow punitive damages without proof of actual damages. The peculiar facts of this case create the rare circumstance under Texas law where punitive damages are recoverable and actual damages are not.

## IV. CONTRIBUTORY NEGLIGENCE

In this action, the jury found four of the class representatives to be contributorily negligent and assessed percentages of causation against these Plaintiffs as follows:

| | |
|---|---|
| Claude Cimino | 15% |
| Sam Brocato | 17% |
| Lowell Nations | 40% |
| Thad Pamplin | 20% |

The Court is hard pressed to identify any evidence in the record to support these jury findings. It, frankly, appears to the Court that the jury disregarded the Court's instruction and assessed a percentage of contributory negligence for smoking; however, the Court is not inclined to set aside these findings.

## V. PREJUDGMENT INTEREST

For cases in this action filed before September 2, 1987, the issue concerning an award of prejudgment interest is governed by *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985). For those individual cases filed on or after September 2, 1987, prejudgment interest is governed

by *Cavnar* as well as by Tex.Rev.Civ.Stat. Ann. art. 5069–1.05 §§ 2 and 6 (Vernon Supp.1990).

### A. Cases Filed Before September 2, 1987

In *Cavnar*, the Texas Supreme Court held that a prevailing plaintiff in a tort action "may recover prejudgment interest compounded daily (based on a 365–day year) on damages that have accrued by the time of judgment." 696 S.W.2d at 554. The court made it clear that "[p]rejudgment interest shall accrue at the prevailing rate that exists on the date judgment is rendered according to the provisions of Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 2...." *Id.* Under *Cavnar*, prejudgment interest is not permitted under Texas law for future or punitive damages. *Id.* at 555–556.

The issue remaining for this Court to decide is what date should be used to compute prejudgment interest. According to *Cavnar*,

> In wrongful death and non-death personal injury cases, interest shall begin to accrue on both pecuniary and non-pecuniary damages from a date six months after the *occurrence of the incident* [underline added] giving rise to the cause of action.

696 S.W.2d at 555. For cases involving a decedent, prejudgment interest is to accrue from the date of death or six months after the *injury-causing incident* occurred, whichever gives rise to the larger interest award. *Id.*

Plaintiffs argue that prejudgment interest should accrue six months after the date each Plaintiff was first exposed to the Defendants' asbestos fibers. The Defendants contend that the accrual date should be six months after the date each Plaintiff was diagnosed as having an asbestos-related injury or disease.

Texas law has rejected the diagnosis date as the operative date for computing prejudgment interest. *See Cavnar*, 696 S.W.2d at 555 and *American Cyanamid Co. v. Frankson*, 732 S.W.2d 648, 660 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.

e.). In an asbestos personal injury case, the incident giving rise to a plaintiff's cause of action is the plaintiff's inhalation of asbestos fibers. *See Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

It is scientifically undisputed that asbestosis is a dose-response disease. Asbestos fibers, once inhaled, remain in place in the lung, causing a tissue reaction that is slowly progressive and irreversible. Typically, the disease does not manifest itself until years after initial exposure to asbestos fibers. The duration of this latency period depends on the individual characteristics of the person exposed. These factors make it impossible to determine which exposure caused the disease. *See Borel*, 493 F.2d at 1083.

The disease of mesothelioma, on the other hand, can be caused by a single exposure to asbestos fibers. As with asbestosis, mesothelioma usually involves a long latency period. It is therefore not possible to determine which exposure caused the disease. *See Borel*, 493 F.2d at 1083.

There is authority for the proposition that prejudgment interest accrues six months after a plaintiff's first exposure to asbestos. In *American Cyanamid Co. v. Frankson*, a Texas court held that the "occurrence" in a personal injury case, involving a defective drug administered in a series of doses, was when the drug was first prescribed by the defendant doctor. 732 S.W.2d at 660. In *Covalt v. Carey Canada, Inc.*, 543 N.E.2d 382, 385 (Ind.1989), the Supreme Court of Indiana noted that, with regard to a latent disease, the "injury begins from the moment the foreign substance is introduced into the body."

■ However, the better reasoned approach is that, in an asbestos suit, prejudgment interest accrues six months after a plaintiff's last exposure to asbestos fibers. As it is not possible with regard to both asbestosis and mesothelioma to determine which exposure caused the disease, the use of the *last exposure date* as the *"incident giving rise to the cause of action"* [under-

line added] comports with the rationale of *Cavnar*—to provide full compensation for plaintiffs by awarding interest on damages that have actually been sustained. *See* 696 S.W.2d at 554–555. As a matter of equity, use of the last exposure date for the accrual of prejudgment interest is more appropriate in an asbestos case.

From the foregoing, this Court finds as a matter of law that prejudgment interest in an asbestos personal injury case filed before September 2, 1987, accrues six months after a Plaintiff's last exposure to asbestos fibers. Prejudgment interest in such cases shall accrue according to the rate established by Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 2 (Vernon 1990).

The Court finds that the following represents the last dates of exposure for the cases of class representatives, filed before September 2, 1987:

| | | |
|---|---|---|
| Robert Dorsey | February 5, 1979 | (Tr. 2065, 2087) |
| Gussie Daigle | 1981 | (Tr. 1658) |
| Norman Atchison | 1973 | (Tr. 3022) |
| LaSalle Rhymes | April 1, 1986 | (Tr. 1929) |
| Claude Cimino | 1972 | (Tr. 1026, 1618–1619) |
| Sam Brocato | 1985 | (Tr. 2131) |
| Lowell Nations | 1988 | (Tr. 2782) |
| Thad Pamplin | 1980 | (Tr. 2599–2600) |

With the exception of the cases of Robert Dorsey and LaSalle Rhymes, pre-judgment interest will accrue six months after the last day of the year given.

### B. Cases Filed On or After September 2, 1987

For cases filed on or after September 2, 1987, Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 6 (Vernon Supp.1990) provides the following:

(a) Judgments in wrongful death, personal injury, and property damage cases *must include* [underline added] prejudgment interest.... [P]rejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered.

\* \* \* \* \* \*

(g) The rate of prejudgment interest shall be the same as the rate of post-judgment interest at the time of judgment and shall be computed as simple interest.

For these cases, *Cavnar*'s rule against prejudgment interest for future and punitive damages still applies. In addition, prejudgment interest in these cases shall accrue at the rate established by Tex.Rev.Civ. Stat.Ann. art. 5069–1.05 § 2 (Vernon Supp. 1990).

### C. Defendants' Contentions

Defendant Pittsburgh Corning argues that Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 6 (Vernon Supp.1990) is applicable to all the cases in this action. Pittsburgh Corning argues that *Cavnar*'s language concerning the accrual date for prejudgment interest is inapplicable to this entire action. Defendant Fibreboard submitted a brief discussing at length the applicability of *Cavnar*'s holding with regard to an accrual date. However, during the April 27, 1990 hearing, counsel for Fibreboard opted for Pittsburgh Corning's position on the issue, stating that he had been fooled by WESTLAW about a recent amendment to article 5069–1.05.

These two Defendants urge that the following language in a 1989 amendatory act to article 5069–1.05 (Vernon Supp.1990) amended the entire article 5069–1.05 so as to make article 5069–1.05 (including Section 6 as quoted above) applicable to all the cases in this action:

SECTION 2. (a) This Act takes effect September 1, 1989 (b) This Act applies to all actions:

(1) commenced on or after the effective date of this Act; or

(2) pending on the effective date of this Act and in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after the effective date of this Act.

This language appears in Chapter 626 of Vernon's 1989 Texas Session Law Service (Session Laws from the 71st Legislature–Regular Session) and has been reprinted by the authors of Vernon's Annotated Texas Statutes in the Historical Note following Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 (Vernon Supp.1990). The Defendants point out

that this action began in February, 1990 and was therefore pending on or after the effective date of the 1989 amendatory act, which is September 1, 1989. The Defendants argue that SECTION 2 of the 1989 amendatory act was intended by the Legislature to follow Sec. 1 of article 5069–1.05 but was placed in the Historical Note at the end of article 5069–1.05 by the authors of Vernon's Annotated Texas Statutes as there was already a Sec. 2 in article 5069–1.05. The Defendants' reading of the 1989 amendatory act is flawed.

The act or Chapter 626 of the Session Laws is clear and unambiguous in its meaning. The first line of Chapter 626 says that it is "An Act relating to prejudgment interest in condemnation cases." The opening line implicitly informs the reader that Chapter 626 does not refer to prejudgment interest in all types of cases and, hence, does not apply to all of article 5069–1.05.

Chapter 626 is divided into three sections. SECTION 1 is reprinted below as it appears in the Session Laws:

> SECTION 1. Article 1.05, Title 79, Revised Statutes (Article 5069–1.05, Vernon's Texas Civil Statutes), is amended by adding Section 7 to read as follows: *Sec. 7. The rate of prejudgment interest in condemnation cases [underline added] shall be the same as the rate of postjudgment interest at the time of judgment and shall be computed as simple interest.*

By its language, SECTION 1 only amends article 5069–1.05 by adding Sec. 7, relating to prejudgment interest in condemnation cases. SECTION 1 does not amend article 5069–1.05 so as to change the effective date of the article. If it had done so, such a change would have appeared in the italics following SECTION 1.

SECTION 2 of Chapter 626 provides information about when the *Act* (i.e., Chapter 626) takes effect:

> SECTION 2. (a) This Act takes effect September 1, 1989. (b) This Act applies to all actions:
>
> (1) commenced on or after the effective date of this Act; or

> (2) pending on the effective date of this Act and in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after the effective date of this Act.
>
> (c) In an action commenced before the effective date of this Act, a trial, new trial, or retrial that is in progress on that effective date is governed with respect to the subject matter of this Act by the applicable law in effect prior to that effective date, and that law is continued in effect for that purpose.

The *Act* in SECTION 2 refers to "An Act relating to prejudgment interest in condemnation cases."

SECTION 2 of Chapter 626 could not have been intended by the Texas Legislature to follow Sec. 1 of art. 5069–1.05 (Vernon Supp.1990) for several reasons. First, there is already a Sec. 2 in article 5069–1.05 and it has not been repealed by the Texas Legislature. Second, by placing SECTION 2 of Chapter 626 after Sec. 1 of article 5069–1.05, it would also be necessary to place SECTION 3 of Chapter 626 after Sec. 2 of article 5069–1.05. SECTION 3 relates to dispensing with the requirement that a bill be read on three several days in each House of the Texas Legislature. The language of SECTION 3 is included in a number of bills. It would be absurd to suggest that it belongs after Sec. 2 of article 5069–1.05. Besides, Sec. 3 of article 5069–1.05 has not been repealed by the Texas Legislature. Third, the lettering of SECTION 2 of Chapter 626 suggests that it was not intended to be placed after Sec. 1 of article 5069–1.05. SECTION 2 is spelled out in capital letters. Sec. 2 of article 5069–1.05 is abbreviated and contains lower case letters. SECTION 2 of Chapter 626 was intended to be placed after SECTION 1 of Chapter 626. All three sections of Chapter 626 amend article 5069–1.05 so as to add Sec. 7 to the article.

The Defendants contend that, as article 5069–1.05 already contains a Sec. 2, the authors and editors of Vernon's Annotated Texas Statutes placed SECTION 2 of Chapter 626 at the end of article 5069–1.05, in the Historical Note, rather than re-number-

ing the article. In effect, the Defendants are arguing that the authors and editors of Vernon's Annotated Texas Statutes amended the entire article 5069–1.05 by adding Chapter 626 at the end of the article.

The legislative history for Chapter 626, which is a reprinting of Senate Bill 1275, supports the Court's reading of the bill. There was no debate in the Texas Legislature concerning Senate Bill 1275. The only persons to speak for or against the bill were its author and sponsor. Senator Barrientos, the bill's author, explained the bill to the Texas Senate by stating that it was designed to bring interest in condemnation cases in line with the prejudgment interest in tort cases. *See* April 27, 1989, taped proceedings of the Texas Senate (71st Legislature–Regular Session). The House sponsor of Senate Bill 1275, Representative Guerrero, explained the bill to the Texas House of Representatives by stating that the bill was designed to make the rate of prejudgment interest in a condemnation case the same as postjudgment interest at the time of judgment. Representative Guerrero explained further that the bill would save counties, cities, and the state money in right of way acquisitions. *See* May 26, 1989, taped proceedings of the Texas House of Representatives (71st Legislature–Regular Session). There was no indication by Senator Barrientos or Representative Guerrero that Senate Bill 1275 was designed to amend article 5069–1.05 so as to change the effective date of the entire article. From the foregoing, this Court finds that Chapter 626 is inapplicable to this action.

## VI. DEFENDANT ASBESTOS CORPORATION LIMITED

Defendant Asbestos Corporation Limited (ACL) is an instrumentality of a foreign sovereign. Therefore, trial of the Plaintiffs' claims against ACL was a non-jury trial before this Court. The Plaintiffs and ACL have each submitted to the Court summaries of the evidence supporting their cases. With regard to the claims against ACL, the Court will enter its Findings of Fact and Conclusions of Law, in conformity with Fed.R.Civ.P. 52(a), at a later date.

Those findings will impose liability on ACL to the class representatives for the products manufactured by Fibreboard from 1951 to 1961. During such period of time, ACL supplied approximately 50 per cent of the asbestos fibers used to make the Fibreboard products.

### A. Choice of Law

ACL is a corporation owned in part by the government of Quebec, Canada. ACL alleges that it mined asbestos solely in the province of Quebec. The first issue for the Court, then, is whether to apply Quebec law or Texas law to the facts of this case. As this issue is not discussed by the parties in their submissions, this analysis will be brief.

■ Suits over foreign sovereigns and their instrumentalities are governed by the Foreign Sovereign Immunities Act (FSIA). *See* 28 U.S.C. 1601 et seq. The FSIA does not contain an express choice of law rule to be applied to actions within its scope. In addition, the Ninth Circuit, in construing 28 U.S.C. 1606, found that the FSIA contained no implicit choice of law rule in a claim for actual damages based on negligence. *See Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1002–1003 (9th Cir.1987). *Accord Liu v. Republic of China*, 892 F.2d 1419, 1425 (9th Cir.1989) (applying federal common law choice of law rule in a non-diversity case). This Court agrees with *Harris'* construction of the FSIA.

A federal district court is bound by the choice of law rules in the forum state in which it sits. *InterFirst Bank Clifton v. Fernandez*, 853 F.2d 292 (5th Cir.1988); *Randall v. Arabian American Oil Co.*, 778 F.2d 1146, 1150 (5th Cir.1985). Therefore, the Court must apply Texas choice of law rules. The Texas Supreme Court has enunciated a rule for all choice of law determinations:

... in all choice of law cases, except those contract cases in which the parties have agreed to a valid choice of law clause, the law of the state with the most significant relationship to the particular substantive issue will be applied to re-

solve that issue: *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984), unless application of the law referred to 'violates good morals, natural justice or is prejudicial to the general interests of our own citizens.' *Gutierrez v. Collins*, 583 S.W.2d 312, 321 (Tex.1979). For tort actions, the court mandated the use of the most significant relationship approach in accordance with the general principles stated in §§ 6 and 145 of the Restatement (Second) of Conflict of Laws. *See Gutierrez*, 583 S.W.2d at 318. An application of §§ 6 and 145 of the Restatement (1971) to the facts of this case makes it clear that Texas law applies to the Plaintiffs' claims against ACL.

### B. Liability and Damages

■ The evidence shows that ACL was a major supplier of raw asbestos to companies that incorporated the asbestos into finished asbestos products. The evidence also shows that ACL knew or should have known as early as 1935 that asbestos workers and household members of asbestos workers were at risk of getting an asbestos-related injury or disease from the application, use, or removal of Defendants' asbestos-containing insulation products. Like Carey Canada, ACL sold its product to intermediaries. These intermediaries incorporated the asbestos into finished products and sold the products to the worksites where the Plaintiffs allege they were exposed to asbestos. The law regarding the Plaintiffs' claims against ACL, then, is the same as that pertaining to claims against Carey Canada. The issue is whether ACL's reliance on its intermediaries to pass on warnings concerning the dangers of asbestos to users of asbestos products was reasonable. *See Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 592 (Tex.1986) *as well as this Court's discussion concerning Carey Canada's liability*. In other words, were ACL's intermediaries capable of passing on a warning and, if not, did ACL know about that incapacity? The specific question this Court must answer is the following: Did ACL have actual knowledge that the raw asbestos it supplied to its intermediaries was being made into insulation products and sold by such companies without an adequate warning? The evidence in the record establishes that ACL did have such knowledge.

It is apparent that ACL's liability is derivative of the intermediaries to which it sold its raw asbestos. With the exception of Fibreboard's products, it is not possible for the Court to determine from the record how much of ACL's raw asbestos found its way into the Defendants' products to which the class representatives were exposed. The Court is also persuaded from the evidence that, with the exception of Fibreboard's products, the Plaintiffs will not be able to prove the amount of ACL fibers contained in the Defendants' products to which the remaining Plaintiffs were exposed.

The evidence does show that, from 1951 until 1961, Fibreboard Corporation purchased over 50% of its raw asbestos from ACL. The Plaintiffs, ACL, and Fibreboard are invited to submit to the Court their suggestions and observations regarding whether the following represents an appropriate formula for the calculation of ACL's liability to the Plaintiffs and the effect on Fibreboard's liability to the Plaintiffs.

$a$ = The number of working years upon which the jury based its award of compensatory damages in this action.

$b$ = Dollar amount representing Fibreboard's percentage of causation for the class representatives' compensatory damages.

$c$ = Number of years after 1951 that a class representative was exposed to Fibreboard's asbestos-containing products (i.e., products containing approximately 50% of ACL's raw asbestos).

$.50$ = ACL's liability toward the class representatives for compensatory damages occurring after 1951.

$d$ = ACL's liability toward a particular class representative for actual damages.

$$\frac{c \times b \times .50}{a} = d$$

ACL's liability to the class representative for actual damages will be joint and several. In addition, Fibreboard's liability for

actual damages will be reduced by the amount represented by $d$.

Under the Foreign Sovereign Immunities Act, a foreign state and its instrumentalities are immune from claims arising out of misrepresentation or deceit. *See* 28 U.S.C. §§ 1604 and 1605. Previously, this Court dismissed the Plaintiffs' conspiracy claims against ACL. As any claim for gross negligence against ACL would necessarily involve misrepresentation or deceit, this Court declines to assess punitive damages against ACL in this action.

## VII. PUNITIVE DAMAGES

The question of liability for punitive damages and the amount to be assessed against Defendants was submitted to the jury in accordance with the procedures established in *Jenkins*. The jury verdict is well supported by the evidence and does not offend the Texas proportionality rule. Both sides waived their right to present evidence relating to net worth or the extent of insurance coverage by electing not to present evidence to the jury in these respects. Texas law clearly requires the Court to apply the punitive damage multiplier to the entire amount of actual damages without reduction for contributory negligence or reductions made by settling tortfeasors. However, whether the Court, for equitable considerations or by way of remittitur, should reduce the multiplier or should give the non-settling Defendants the benefit of reductions due to settlements made by settling Defendants, the Court reserves for another day.