James F. SRITE and Erma M. Srite; James H. Bell and Mickey Bell; Estate of Otis Burt, Mable Burt, Ronald Burt, Kathy Hunter, and Gloria Polumbo, Appellants,

v.

OWENS–ILLINOIS, INC., Fibreboard Corporation, and Pittsburgh–Corning Corporation, Appellees,

Raymond JOCHIM and Mary Jochim; Clarence Ben and Ednora Ben; Erma Rae Friley, Individually and as Representative of the Estate of Joseph Friley; James Morris and Helen Morris; Robert E. Bledsoe and Ellois Bledsoe; Clyde Spikes and Ruby Spikes, Appellants,

v.

OWENS–ILLINOIS, INC., Fibreboard Corporation, Pittsburgh–Corning Corporation, and Keene Corporation, Appellees.

Nos. 01–91–01383–CV to 01–91–01387–CV and 01–92–00285–CV to 01–92–00288–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 18, 1993.

Rehearing Overruled Jan. 6, 1994.

Richard N. Countiss, Burrow, Countiss & Barrie, L.L.P., Umphrey, Williams & Bailey, Houston, for appellants.

Strong, Pipkin, Nelson & Bissell, L.L.P., Beaumont, James H. Powers, Gwendolyn S. Frost, Roberts, Markel, Folger & Powers, Houston, Mr. John Cummings, Hassard, Bonnington, Rogers & Huger, R. Lyn Stevens, Nicholas S. Baldo, Weller, Wheelus & Green, Beaumont, for appellees.

Before HEDGES, DUGGAN and WILSON, JJ.

## OPINION

HEDGES, Justice.

In this case, we are asked to decide the proper standard of appellate review when a jury finds liability yet awards no damages. We further must determine the proper measure of prejudgment interest under *Cavnar v. Quality Control Parking*, 696 S.W.2d 549 (Tex.1985), in the instance of a latent disease whose manifestation potentially occurs many years after the injury. From nine separate asbestos cases that were grouped for trial, appeal was taken by plaintiffs as follows: six workers and their wives, Clyde Spikes and Ruby Spikes, Robert Bledsoe and Ellois Bledsoe, Clarence Ben and Ednora Ben, Raymond Jochim and Mary Jochim, James Morris and Helen Morris, and James Bell and Mickey Bell; one worker whose wife died before trial, James Srite; and the estates and families of two workers, Otis Burt and Joseph Friley. Defendants are Owens–Illinois, Inc.; Fibreboard Corporation; and Pittsburgh–Corning Corporation. Additionally, Keene Corporation is an appellee in the Friley, Morris, Jochim, Ben, Bledsoe, and Spikes cases.

Trial was to a jury, which considered strict liability and negligence theories of recovery. The jury was asked to assess the past and future damages of the workers for physical pain, mental anguish, loss of earning capacity, physical impairment, and future medical care. It was also asked to assess the past and future damages of the wives for loss of household services and loss of consortium. The jury found:

1) all defendants were liable for negligence that proximately caused injury to the living workers and the death of the deceased workers.

2) each worker was contributorily negligent.

3) all defendants were strictly liable, except in the death of Joseph Friley.

4) defendants were not liable for gross negligence.

The jury also determined the percentage of injury caused by each asbestos company and each worker. It assessed from three percent to five percent of the fault to each worker, and the remaining 95 percent to 97 percent to the asbestos companies.

The jury awarded damages as follows:

| | | | | |
|---|---|---|---|---|
| James Bell | Past: | $0 | Future: | $30,000 |
| Mickey Bell | Past: | $0 | Future: | $ 5,000 |
| Clarence Ben | Past: | $0 | Future: | $40,000 |
| Ednora Ben | Past: | $0 | Future: | $ 5,000 |
| Robert Bledsoe | Past: | $0 | Future: | $65,000 |
| Ellois Bledsoe | Past: | $0 | Future: | $0 |
| Raymond Jochim | Past: | $0 | Future: | $45,000 |
| Mary Jochim | Past: | $0 | Future: | $10,000 |
| James Morris | Past: | $0 | Future: | $30,000 |
| Helen Morris | Past: | $0 | Future: | $ 5,000 |
| Clyde Spikes | Past: | $20,000 | Future: | $25,000 |
| Ruby Spikes | Past: | $0 | Future: | $10,000 |
| James Srite | Past: | $20,000 | Future: | $25,000 |
| Otis Burt | Past: | $25,000 | | |
| Mable Burt | Past: | $20,000 | | |
| Joseph Friley | Past: | $20,000 | | |
| Erma Friley | Past: | $10,000 | | |

The jury also awarded wrongful death damages to the Burt and Friley families. It found facts that led the trial court to impose a limitations bar on recovery by the Spikes family. Judgments were rendered on the verdicts after damages were reduced by comparative causation findings and settlement credits.

## Points on Appeal

Plaintiffs appeal the judgments on the basis that the jury verdicts are inherently inconsistent. They argue that under Texas law and based on the trial record, a jury cannot find liability and future damages but award no past damages. They complain that the limitations finding in the Spikes cause is deficient because defendants did not meet their evidentiary burden. They claim that the trial court erred by allowing two expert witnesses to testify despite the incomplete description of their testimony in discovery responses. Finally, they maintain that the trial court picked an incorrect starting date for prejudgment interest.

## Past Damages

In point of error one, plaintiffs argue that the jury's failure to award past damages to James Bell, Mickey Bell, Clarence Ben, Ednora Ben, Robert Bledsoe, Ellois Bledsoe, Raymond Jochim, Mary Jochim, James Morris, Helen Morris, and Ruby Spikes is against the great weight and preponderance of the evidence. In point of error two, plaintiffs maintain that they conclusively established their entitlement to past damages. In point of error three, they contend that the jury reversibly erred by failing to award damages for every element of damages they proved.

■ Under these first three points of error, plaintiffs direct our attention to the "zero damages rule," which they assert requires us to reverse and remand for a new trial. The zero damages rule stands for the proposition that if a jury finds liability, it must award damages if there is any objective evidence of damages. *Hammond v. Estate*, 643 S.W.2d 222, 223 (Tex.App.—Eastland 1981, writ ref'd n.r.e.); *Kraatz v. Faubion*, 617 S.W.2d 277, 279 (Tex.Civ.App.—Eastland 1981, no writ); *Dupree v. Blackmon*, 481 S.W.2d 216, 221 (Tex.Civ.App.—Beaumont 1972, writ ref'd n.r.e.).

We are unpersuaded by plaintiffs' argument. The zero damages rule conflicts with the standard of review articulated by the Texas Supreme Court in the case of *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). Under the *Pool* standard, an appellate court first must review the entire record to determine if any evidence supports the jury's award of zero damages. If some evidence is found in support of the jury's failure to award damages, then the court must weigh all the evidence. Reversal is authorized only if the court expressly determines that the finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Id.* at 635; *see generally* R. Gonzales & R. Gilbreath, *Appellate Review of a Jury's Finding of "Zero Damages,"* 54 Tex.Bar J. 418, 419 (May 1991) (proper analysis for re-

viewing court is to weigh all the evidence, in order to determine whether the jury's finding is so contrary to the evidence as to be manifestly unjust). This Court has concluded that if a plaintiff has *objective* symptoms of injury, the plaintiff's evidence cannot be disregarded by the jury. *Hicks v. Ricardo,* 834 S.W.2d 587, 591 (Tex.App.—Houston [1st Dist.] 1992, no writ). If, however, the plaintiff's complaints are *subjective* in nature and therefore incapable of direct proof, the jury may award zero damages. *Hyler v. Boytor,* 823 S.W.2d 425, 427–28 (Tex.App.—Houston [1st Dist.] 1992, no writ) (citing *Blizzard v. Nationwide Mut. Fire Ins. Co.,* 756 S.W.2d 801, 805 (Tex.App.—Dallas 1988, no writ)).

■ If a party establishes damages as a matter of law, the jury is not at liberty to award zero damages. *Lowery v. Berry,* 269 S.W.2d 795, 796–97 (Tex.1954). To evaluate plaintiffs' claims that they conclusively proved past damages, we first consider only evidence that supports the jury finding and reject all evidence or reasonable inferences to the contrary. If there is no evidence to support the jury's finding of zero damages, we then examine the entire record to determine if the plaintiffs' damages were proved as a matter of law. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982).

In considering a challenge that a finding is against the great weight and preponderance of the evidence, we follow the teachings of *Pool* and adhere to the standard of review fashioned by *In re King's Estate,* 244 S.W.2d 660, 661 (Tex.1951). Under that analysis, we consider and weigh all of the evidence in the case, both the evidence that tends to support the existence of a vital fact, and evidence that tends to disprove its existence. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We set aside a jury verdict and remand for a new trial only if we conclude that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 244 S.W.2d at 661; *Robinson v. Minick,* 755 S.W.2d 890, 891 (Tex. App.—Houston [1st Dist.] 1988, writ denied). In accordance with this Court's precedent, we then consider whether the indicia of injury are more subjective than objective. *Hyler,* 823 S.W.2d at 427.

We acknowledge the general rule that a jury finding is entitled to great deference by the appellate court, unless the record reflects that the jury was motivated by passion, prejudice, or something other than conscientious conviction. *International Harvester Co. v. Zavala,* 623 S.W.2d 699, 708 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) (citing *Donaghey v. Van Cleave,* 456 S.W.2d 524 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd n.r.e.)). A jury has alternatives available when presented with conflicting evidence, and it may believe one witness and disbelieve others. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). It is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 549 (1962). A jury finding cannot be set aside on appeal merely because the reviewing court would have weighed the evidence differently or reached another conclusion. A jury finding is properly set aside only if it is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651 (Tex.1988).

### Evidence of Past Damages

■ Our review of the record shows evidence concerning plaintiffs' past damages consisted of the following:

### James and Helen Morris

James Morris, a 65–year–old boilermaker, works full time in Hawaii. He testified that he "just get[s] short winded, is all"; that he "can't keep up with" his wife (who is 15 years his junior) when they ride bikes; and that he is "tired out after working eight hours." He noted that, in his younger days, he could work longer. He testified that he is afraid of cancer. Mr. Morris said he had been to the emergency room in September 1989 and that he had shortness of breath on exertion, which he attributed to a 35–pound weight gain. On cross-examination, Mr. Morris added that he had not lost any time from work; that he had broken some ribs in a recent fall; that he had been hospitalized with pneumonia; and

that he suffered from sinus problems. Although on direct examination he testified that he had lost over $30,000 in wages because of his disease, he stated on cross-examination that he had not lost wages. In fact, he was making $52 per hour in Hawaii, whereas a boilermaker in Texas would probably make $14 per hour.

Gary Friedman, M.D., an expert for plaintiffs, testified that Mr. Morris had bilateral pleural thickening in 1985 and that he had a possible calcification over the diaphragm. According to Dr. Friedman, Mr. Morris would have mild impairment or disability, based on his pulmonary function test. He diagnosed Mr. Morris as having asbestos-related pleural disease.

Keith Wilson, M.D., a defense expert, opined that Mr. Morris does not have asbestosis. He also testified that Mr. Morris does not have any disability, at least as it relates to respiratory function. On Mr. Morris' 1991 X-ray, there was a little plaque and a small patch of probable atelectasis (failure of part of the lung to expand), but no increase in interstitial (small space in a tissue or between parts of the body) markings, and the atelectasis was likely from an old infection. Dr. Wilson testified that Mr. Morris is obese and that the obesity may have an effect on his X-ray through the development of pleural changes called subpleural fat. In addition, as the chest wall becomes heavier, it alters pulmonary function and may alter the ability to take a deep breath. Dr. Wilson stated that although Mr. Morris' obesity is sufficient to produce a reduction in pulmonary function, this reduction would not prevent Mr. Morris from carrying out normal activities on the job.

Mrs. Morris testified Mr. Morris used to be "very active," but that now he "gets out of breath quicker." She stated that when they went walking, Mr. Morris did not take the lead.

### Robert and Ellois Bledsoe

Robert Bledsoe is a 57–year–old electrician. On direct examination, Mr. Bledsoe testified that one aspect of his job was to climb up 300–foot tall flare stacks to install "igniters." Mr. Bledsoe testified that he "used to be able to do that [but he] can't do it anymore." He stated that he could not climb and do the work he used to do because he was "out of breath." He testified that he was afraid of cancer and that he had lost earnings because of his asbestosis. The record shows that Mr. Bledsoe has had open heart surgery. He was rushed to the hospital in 1987 with a possible heart attack, and he had a stroke in February of 1987. He had once "passed out" from breathing fumes on the job site. Mr. Bledsoe was a welder for 25 years, and welding can cause scarring of the lungs. He also suffered a back injury in 1972, and a mediastinal mass, which is an enlargement of the upper cavity of the chest where the heart is located. Mr. Bledsoe has had pneumonia, high blood pressure, and heart valve repair. Although he had testified on deposition that his stroke had affected his ability to work, he denied that effect at trial.

Dr. Friedman testified that Mr. Bledsoe has lung scarring that can be attributed to asbestos exposure, but he recognized that welding fumes could have played a role in the scarring.

Dr. Wilson did not diagnose asbestosis when he examined Mr. Bledsoe in 1987. Nor could he see any increase in interstitial markings in the base of either lung in 1991. Dr. Wilson read the 1991 X-ray as normal, concluding that Mr. Bledsoe did not have asbestosis. He opined that based on pulmonary function testing, Mr. Bledsoe experienced mild reduction in forced vital capacity, but that he had normal total lung capacity. In addition, Dr. Wilson testified that in 1990, Mr. Bledsoe put forth such a poor effort on pulmonary function tests that it was difficult to draw conclusions from the test.

Mrs. Bledsoe was disabled and did not testify at trial.

### James and Mickey Bell

James H. Bell was 58 years old at the time of trial. He testified that he voluntarily retired at 56, not because of any health problems, but rather because he had planned to retire early. Mr. Bell had worked around refineries his entire adult life. He spent the bulk of his employment working at Ethyl

Corporation as an "outside machinist." His job required him to be in good physical condition, and he was in good shape until the time he retired. He is afraid of cancer and has other fears and concerns related to asbestosis. He smoked cigarettes for a number of years in the past, and he has shortness of breath. At the time of trial, he smoked a pipe.

Dr. Friedman concluded that he could not say with certainty that Mr. Bell does not have interstitial scarring and pulmonary asbestosis. He testified that while he did not think Bell has asbestosis, he could not deny its existence with absolute certainty. He saw no evidence that Bell would develop asbestosis in the next two or three years. In addition, Mr. Bell's examination was good and his chest clear; there were no rales (soft, fine crackling sounds heard in the lungs through a stethoscope), which might be heard with asbestosis; and his pulmonary function studies showed only a mild obstruction of air flow. Mr. Bell does not have interstitial fibrosis; he is not disabled; and his lung function is within normal range.

Mrs. Bell testified that Mr. Bell could not work around the house like he used to because he "gets tired too easy." When asked by plaintiffs' counsel "what types of activities does it take to get him short of breath?," Mrs. Bell replied, "Well, tilling the garden, brushhogging, baling hay, things like that he has to do." Mrs. Bell testified that she smoked two and one-half to three packs of cigarettes a day for most of the 34 years they had been married. She remembered her husband's complaining about breathing cigarette fumes.

### Raymond and Mary Jochim

At the time of trial, Mr. Jochim was a 59–year-old boilermaker. He claimed that he had shortness of breath, which he noticed when climbing stairs or ladders at work. He also testified that he could no longer cut the grass as he used to be able to do. He admitted that other activities had not been curtailed. In addition, he stated that, at work, he "can't go as long as [he] used to when [he's] doing something." He is worried about cancer. On cross-examination, Mr. Jo-chim admitted that he began smoking Lucky Strike unfiltered cigarettes at age 15 or 16 and that he still smoked. At the time of trial, he still worked as a boilermaker, and he had not lost any time from work because of health problems related to asbestos exposure. Fourteen years before trial, he was admitted to a hospital with a smoke inhalation injury resulting from a chemical fire.

Dr. Friedman testified that Mr. Jochim has pleural thickening, which is pulmonary asbestosis with mild airway obstruction. This condition is attributable to both asbestos exposure and to cigarette smoking. According to Dr. Friedman, Mr. Jochim had mild to moderate impairment, but was able to perform most jobs.

Defendants' expert testified that Jochim had mild interstitial markings that caused no physiologic abnormalities, and there was no impairment of Mr. Jochim's lung function.

Mrs. Jochim testified that Mr. Jochim has shortness of breath when he does work around the house, such as cutting grass in the yard. She stated that whereas Mr. Jochim used to cut the yard and do the edging all in one day, he now cuts the yard on one day and edges the yard on the next day. Although her husband used to be strong, he does not have as much energy as he did in the past.

### Clyde and Ruby Spikes

At the time of trial, Mr. Spikes was 70 years old. He had retired six years earlier because he could no longer go up stairs and climb towers like he could when he was younger. He wheezed and coughed and could not keep up with his wife when they went walking at the mall. He began smoking at the age of 10 but had cut back from one pack a day to half a pack a day by the time of trial. On cross-examination, Mr. Spikes testified that he had been exposed to fumes during his years of working as a welder. He was injured once on the job when he inhaled chlorine gas, which burned him throughout his chest cavity. He also had an accident when a hot catalyst line exploded and blew hot catalyst all over him, burning

him so badly that he had to have skin grafts. He admitted that he was a heavy drinker.

Dr. Friedman testified that Mr. Spikes has pleural thickening, calcification of the diaphragm, pleural plaque, and asbestosis. Mr. Spikes has airway obstruction, which Dr. Friedman attributes to smoking and to asbestos exposure.

Dr. Wilson testified there was no evidence of asbestosis on Mr. Spikes' x-ray and that Mr. Spikes was not disabled from the standpoint of lung function. Mr. Spikes' 50–year history of smoking a pack of cigarettes a day was enough to cause lung damage.

Mrs. Spikes testified that Mr. Spikes could not keep up with her at the mall. She stated that her husband had been a very strong man in his day, but that now he has "failed." Mr. Spikes cannot do all the cranking and other work required to set up their travel trailer. He is unable even to spread sand in their yard.

### Clarence and Ednora Ben

Mr. Ben was 68 years old at the time of trial. He testified that he became short of breath, suffered dizziness, and had chest pains whenever he walked or did anything around the house. He worries about cancer and has lost the ability to enjoy his family and his marriage. He is in physical pain. Mr. Ben had been employed at the Petrotex Refinery in the labor department as an insulator. He worked on a daily basis as a sandblaster throughout his tenure at Petrotex, from 1958 until 1984. He had an operation on his knees to correct poor circulation in his left leg and ultimately retired because of his leg problem. He had surgery to correct a pulled disc in his back.

Paul Stevens, M.D., a defense expert, testified that Mr. Ben had considerable exposure to sandblasting for about 15 years, often without a well-ventilated hood. Dr. Stevens confirmed that Mr. Ben's job difficulties were primarily because of low back problems that required back surgery. He determined that Mr. Ben could not do much in the way of physical exertion to test his breathing, due to his back problems; that shortness of breath is usually tested by what physical activities

someone can do; and that, in Mr. Ben's case, his activity was very limited by the disability in his back and legs. Mr. Ben started smoking at age 12 and has smoked two packs per day for 50 years. His smoking history, by itself, accounted for his pulmonary problems. Dr. Stevens also found that Mr. Ben had sinus problems, nose problems, dizzy spells, chest pain, prostate enlargement, leg weakness, and peripheral neuropathy (diseases of the nerves). There was no evidence of increased interstitial markings in the lower lung zones, and the scarring present in the lower lungs was not related to asbestos exposure. Based on pulmonary function tests done in 1991, Dr. Stevens concluded that there was no evidence of disability related to his pulmonary condition. Based on the fact that Mr. Ben's X-rays did not show asbestosis, Dr. Stevens was able to opine that he did not have the disease.

Dr. Friedman's and Dr. Steven's testimony showed that Mr. Ben suffers from diabetes, vascular disease, a slipped disc, possible tuberculosis of the lung, angina that suggests coronary artery disease, and chronic obstructive pulmonary fibrosis. Sandblasting causes silicosis, and silicosis predisposes a person to tuberculosis. Mr. Ben had also been exposed to amylhydride, a fume that can produce varying degrees of lung dysfunction.

Mrs. Ben testified that Mr. Ben had smoked cigarettes for a number of years, but quit five weeks before trial. She stated that Mr. Ben had shortness of breath that prevented his cutting the yard, helping her vacuum, and helping with their grandchildren. She noted that Mr. Ben could not play ball with the kids anymore.

### Expert Testimony

Various experts testified at trial about the mechanics of the lung, the role of the lung in supporting life, and the reaction of the lung to exposure to foreign substances, including asbestos fibers. Asbestos-related diseases are *long latency diseases*, meaning that the diseases manifest themselves many years, perhaps 15 or 20, after exposure to asbestos.

Dr. Friedman, a specialist in lung diseases, pulmonary disease, internal medicine, and occupational diseases, gave his observations

and diagnoses of the plaintiffs' ailments. Dr. Wilson, a board certified specialist in internal medicine and pulmonary disease, testified about the health effects of asbestos exposure in general. He explained the results of his examinations of certain plaintiffs and offered his professional opinion on the physical condition of each plaintiff. He opined about the effect of asbestos exposure, as well as other factors, including cigarette smoking, on the health of each plaintiff. Dr. Stevens, also a board certified specialist in internal medicine and pulmonary disease, provided the results of his examinations of certain plaintiffs and offered his professional opinion regarding the physical condition of those plaintiffs.

Plaintiffs' testimony, for the most part, concerned subjective indicia of their injuries. Any objective evidence of plaintiffs' injuries was obtained from the expert witness' testimony. Testimony by plaintiffs' expert regarding the cause and extent of impairment is contradicted in many respects by the testimony of defendants' experts; therefore, none of the experts' testimony is conclusive.

It is within the jury's province to weigh the evidence and determine the credibility of each witness. The jury can believe part or all of the testimony. *Gray v. Floyd,* 783 S.W.2d 214, 216 (Tex.App.—Houston [1st Dist.] 1989, no writ). An appellate court cannot substitute its judgment for that of the jury, even if the court would have decided the issue differently, where the jury determination is supported by some evidence. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex. 1988). The award of damages was within the province of the jury. *Perry v. Safeco Ins. Co.,* 821 S.W.2d 279, 282 (Tex.App.—Houston [1st Dist.] 1991, writ denied). It will not be set aside absent a clear showing that passion, prejudice, or other improper matters influenced the jury. *K–Mart Corp. v. Trotti,* 677 S.W.2d 632, 640 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

In question number seven concerning actual damages, the jury was specifically instructed "not [to] include any amount for any condition not resulting from an asbestos-containing product." We hold that the jury findings (1) that any injury the plaintiffs may have suffered would give rise to future damages that had not yet manifested themselves at the time of trial and (2) that any physical maladies that plaintiffs may have had at the time of trial resulted from other sources were not against the great weight and preponderance of the evidence. We therefore overrule point of error two. We further hold the jury's award of zero past damages was not so against the great weight and preponderance of the evidence that the finding was manifestly unjust, shocked the conscience, or clearly demonstrated bias. We overrule points of error one, two, and three.

## Limitations

■ In point of error four, plaintiffs challenge the legal and the factual sufficiency of the jury's answer to question number 11 relating to whether Mr. Spikes' claim was time-barred. The jury found that Mr. Spikes knew or should have known before February 5, 1984, that he had been injured by exposure to asbestos-related products. February 5, 1984, is two years before Mr. Spikes filed his lawsuit. Based on the jury's response to question number 11, the statute of limitations had run on his cause of action. Accordingly, the trial court denied Mr. and Mrs. Spikes the $55,000 jury award. Plaintiffs maintain that there is no evidence, or at least insufficient evidence, that Mr. Spikes had an asbestos-related disease on or before February 5, 1984. They contend that the earliest diagnosis of his asbestosis occurred in 1985.

■ Under Texas law, the statute of limitations for suits involving personal injury is two years. TEX.CIV.PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986). Unless a plaintiff brings suit not later than two years after the cause of action accrues, the claim is barred. *Id.* As a general rule, a cause of action accrues when the wrongful act effects an injury, regardless of when the plaintiff learns of the injury. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). In certain contexts, however, Texas courts apply the discovery rule as an exception to the general accrual rule. *Id.; Weaver v. Witt,* 561 S.W.2d 792, 794 (Tex.1977). Recognizing that some injuries are "properly characterized as inherently undiscoverable," courts have applied the rule only to such injuries.

**564**

*Rose v. Baker & Botts,* 816 S.W.2d 805, 816 (Tex.App.—Houston [1st Dist.] 1991, writ denied). When the rule applies, it tolls the running of the statute of limitations until such time as the plaintiff discovers, or through the exercise of reasonable diligence, should have discovered, the nature of his injury. *Moreno,* 787 S.W.2d at 351; *Rose,* 816 S.W.2d at 816.

■ The discovery rule is a plea in confession and avoidance to a defendant's affirmative defense of limitations. *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988). As such, it must be pleaded and proved by the plaintiff in his original or subsequent petition; otherwise, it is waived. *Woods,* 769 S.W.2d at 518 (citing Tex. R.Civ.P. 94); *Bowe v. General Motors Corp.,* 830 S.W.2d 775, 778 (Tex.App.—Houston [1st Dist.] 1992, writ denied).

■ Although Mr. Spikes did not plead the discovery rule, defendants did not object on that basis to trial testimony regarding when Mr. Spikes discovered he had asbestosis. Nor did they object to submission of jury question number 11, which asks, "On or before February 5, 1984, did Clyde Spikes *know, or in the exercise of reasonable diligence should he have known,* that he had suffered injury from exposure to asbestos-related products?" (Emphasis added.) Therefore, defendants waived their objection to plaintiffs' failure to plead the discovery rule, and we are not called upon to determine whether the discovery rule was properly submitted in this case.

Because there can be no knowledge of an injury if there is no injury, we must first decide whether the evidence was legally or factually sufficient to show that Mr. Spikes suffered injury on or before February 5, 1984, and, then whether the evidence was legally or factually sufficient to show that Mr. Spikes knew or should have known of his injury, on or before that date. Defendants had to prove that Spikes suffered an injury before February 5, 1984. Spikes then had to prove that he did not know or should not in the exercise of reasonable diligence have known of his injury on or before this date.

**No Evidence**

**1. Injury**

■ In deciding a no evidence point, we consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988); *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex.App.—Houston [1st Dist.] 1988, no writ). If there is more than a scintilla of evidence to support the finding, we must overrule the no evidence point of error. *Sherman,* 760 S.W.2d at 242.

Plaintiffs offered as an exhibit a medical records summary containing the following entry by Dr. Ahmed Pacha dated February 24, 1983:

CXR: Pleural calcification seen about left hemidiaphragm. Usually with asbestosis, the disease process is more diffuse, nevertheless that is still a consideration.

This entry represents a scintilla of evidence sufficient to support the jury finding. We hold there was legally sufficient evidence that, on or before February 5, 1984, Mr. Spikes had suffered an injury from exposure to asbestos-related products.

**2. Knowledge of Injury**

Where a party attacks the legal sufficiency of an adverse finding on an issue on which he had the burden of proof, he must overcome two hurdles. *Sterner,* 767 S.W.2d at 690. First, the record must be examined for evidence that supports the jury's finding, while ignoring all evidence to the contrary. *Id.* Second, if there is no evidence to support the fact finder's answer, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.*

The only evidence to support the finding that Mr. Spikes had knowledge or should have had knowledge of an injury before February 5, 1984, is the following cross-examination between Mr. Spikes and counsel for Owens–Illinois:

COUNSEL: Dr. Pacha, was he the first doctor to mention the possibility to you had asbestosis or asbestos-related condition.

MR. SPIKES: I'm sure he was. That's the first time I knew anything about it.

Spikes cannot overcome the first hurdle. His testimony is some evidence that he knew or should have known on or before February 5, 1984, he had suffered an injury from exposure to asbestos-related products. Accordingly, we find that the evidence is legally sufficient to support the jury's answer to question number 11.

### Sufficiency of Evidence

#### 1. Injury

We now address Spikes' factual sufficiency challenge. In reviewing a factual sufficiency point, we examine all of the evidence, both that which supports the finding and that which controverts it. *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986); *Otis Elevator*, 749 S.W.2d at 923. We set aside a jury finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Lofton*, 720 S.W.2d at 805. Accordingly, we review the entire record to determine whether the jury finding meets that standard. *Cain*, 709 S.W.2d at 176.

The only evidence to support the finding that Mr. Spikes was injured before February 5, 1984, is Dr. Pacha's entry on Spikes' medical record suggesting asbestosis as a "consideration." The controverting evidence is (1) the actual diagnosis by Dr. Friedman in 1985, (2) the expert testimony presented by defendants suggesting that Mr. Spikes did not have asbestosis before February 5, 1984, (3) the testimony by Mr. Spikes that he did not know Dr. Pacha, and (4) the testimony by Mr. Spikes that prior to the 1985 diagnosis, no doctor had ever discussed an asbestos-related injury with him.

Against the controverting evidence, a mere notation on a medical record suggesting the "consideration" of an asbestos-related injury following the statement, "[u]sually with asbestosis, the disease process is more diffuse," does not form a definitive enough basis to support a finding of injury, resulting in a bar of Mr. Spikes' cause of action. As such, we hold that the jury finding was so against the great weight and preponderance of the con-troverting evidence that it is manifestly unjust.

#### 2. Knowledge of Injury

Because of our holding on injury to Spikes, it is unnecessary to reach the question of sufficiency of the evidence relating to Spikes' knowledge of injury.

We sustain point of error four.

### Expert Testimony

■ In point of error five, plaintiffs argue the trial court erred by admitting the testimony of defendants' expert witnesses, Dr. Wilson and Dr. Stevens, because in response to interrogatories, defendants failed to properly designate them as witnesses and to disclose their opinions. The trial court considered and denied plaintiffs' pretrial motion to exclude the testimony of these witnesses. During trial, but before the witnesses were presented to testify, plaintiffs objected to their testimony by written motion, which the trial court denied.

Two weeks later, however, plaintiffs failed to object during trial when defendants called Dr. Wilson and Dr. Stevens as witnesses. To preserve error regarding the admissibility of evidence, a party must present a timely objection when the witness is presented to testify. *Clark v. Trailways, Inc.*, 774 S.W.2d 644, 647–48 (Tex.1989), *cert. denied*, 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1028 (1990); *Wilson v. Rice*, 807 S.W.2d 836, 839 (Tex.App.—Waco 1991, writ denied). TEX. R.APP.P. 52(a). Failing to object when the witness is presented to testify denies a trial court the opportunity to correct a prior ruling. *See Clark*, 774 S.W.2d at 647. Because plaintiffs did not properly preserve their complaint regarding admission of the testimony of these doctors, we do not consider the admissibility of the testimony.

We overrule point of error five.

### Prejudgment Interest

■ In point of error six, plaintiffs assert that the trial court erred in its calculation of prejudgment interest in the Burt and Friley judgments. The trial court began the accrual of prejudgment interest six months after

the filing of the respective lawsuits. Plaintiffs urge the adoption of the last exposure date as the proper accrual commencement date.

The Texas Supreme Court first addressed the computation of prejudgment interest on awards of past damages in personal injury, wrongful death, and survival actions in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 551–56 (Tex.1985). In 1987, the Texas Legislature added section 6 to article 5069–1.05 of Texas Revised Civil Statutes Annotated [1], codifying prejudgment interest rules and preempting *Cavnar* as of the section's effective date, September 2, 1987. Actions filed prior to the effective date are still governed by *Cavnar*.[2] The Burts filed on March 22, 1985; the Frileys filed on January 27, 1986. Therefore, *Cavnar* governs prejudgment interest on the Burts' and Frileys' judgments.

*Cavnar* provides that prejudgment interest accrues "on wrongful death and non-death personal injury cases . . . on both pecuniary and non-pecuniary damages from a date six months after the *occurrence of the incident* giving rise to the cause of action." 696 S.W.2d at 555 (emphasis added). On survival actions, interest accrues either from the date of death or six months after the injury causing incident, whichever yields the larger interest award. *Id.*

Under TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6, the date on which prejudgment interest begins to accrue differs from the *Cavnar* commencement date. *Cavnar* begins accrual six months from the date the *injury occurred.* 696 S.W.2d at 555. The statute, however, commences prejudgment interest 180 days from *the date that notice of claim was received or the date suit was filed:*

> [P]rejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, which-

ever occurs first, and ending on the day preceding the date judgment is rendered. TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6(a) (Vernon Supp.1993). Thus, the *Cavnar* date focuses solely on the *injury*, whereas the *cause of action* controls the statutory date.

Defendants urge us to adopt a cause of action commencement date. They would engraft a discovery-type analysis, such as that applied to a limitations issue, to accommodate the special difficulties in identifying the date of injury in actions for long latency diseases. We do not believe that *Cavnar* contemplates such flexibility. In fact, *Cavnar* specifically rejected the calculation proposed by defendants:

> A few jurisdictions allow recovery of prejudgment interest as of the date the cause of action accrues. This approach, however, does not preserve the integrity of the principle that prejudgment interest is not meant to punish defendant's behavior, but to achieve full compensation for plaintiffs.

*Id.* at 555.[3]

The trial court's accrual of prejudgment interest six months after the lawsuits were filed was erroneous. We are mindful that this method mirrors the statutory provision. But plaintiffs' cases were filed before the effective date of the statute and thus fall outside its governance. Constrained as we are by *Cavnar*, we hold that prejudgment interest on past damages awards begins to accrue "from a date six months after the occurrence of the incident giving rise to the cause of action." *Cavnar*, 696 S.W.2d at 555.

We look to the record to identify the *incident* from which the cause of action arises. There is evidence that the incident began the first time each worker was exposed to asbestos and that it continued until the last time each worker was exposed. The exact dates are impossible to identify; the most we can ascertain are the dates on which each worker began employment and each worker's termination date. Logically, the injuries must have occurred during those years. We hold

---

1. Act of June 16, 1987, 70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex.Gen.Laws 51, 51–52.

2. Act of June 16, 1987, 70th Leg., 1st C.S., ch. 3, § 3(a)(1), 1987 Tex.Gen.Laws 51, 52.

3. Although the Texas Legislature adopted defendants' position in TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6, the effective date of that section of the statute does not govern the present action.

that accrual of prejudgment interest commences six months from the litigants' last day of exposure to asbestos in the workplace, the date corresponding to the last day the incident causing the injury occurred. *See Cimino v. Raymark Indus., Inc.,* 739 F.Supp. 328, 333–34 (E.D.Tex.1990).

We are unpersuaded by those decisions that commence prejudgment interest on the date a worker inhales the first asbestos fiber. *See, e.g., Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 660 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.). The reasoning of *Cimino* is more impelling if we must choose between first and last exposure:

> As it is not possible with regard to both asbestosis and mesothelioma to determine which exposure caused the disease, the use of the last exposure date as the "incident giving rise to the cause of action" comports with the rationale of *Cavnar*—to provide full compensation for plaintiffs by awarding interest on damages that have actually been sustained.

*Cimino,* 739 F.Supp. at 334.

We sustain point of error six.

Because the record contains no evidence identifying the last date on which these litigants were exposed to asbestos in the workplace, we are unable to reform the judgment. Therefore, the judgment in the Burt and Friley causes of action are reversed and the causes remanded. Further, we reverse the portion of the judgment denying an award in the Spikes cause of action and remand the cause of action to the trial court for further proceedings in accordance with this opinion.

Except as provided in this opinion, the judgment of the trial court is affirmed.

WILSON, J., concurring without opinion.

The Court voted to determine if the cause should be heard en banc, TEX.R.APP.P. 79(d), (e).

DUGGAN, COHEN, MIRABAL, WILSON, HEDGES, and ANDELL, JJ., voted against en banc consideration.

HUTSON–DUNN, J., voted for en banc consideration.

OLIVER–PARROTT, C.J., and O'CONNOR, J., recused themselves.

HUTSON–DUNN, J., dissenting from the Court's refusal to consider the cause en banc.

HUSTON–DUNN, Justice, dissenting from refusal to consider en banc.

I dissent from the Court's refusal to consider these causes en banc.

The mechanical application of the *Cavnar* rule [1] to this case, without addressing the equity that supports *Cavnar,* results in an unfair prejudgment interest award against the defendants. *See* op. at 565–567. This is because no one in the world, including the plaintiffs and defendants in the case before us, was aware at the time the incident occurred that the substance, which the defendants manufactured, would result in a latency disease whose symptoms are manifested years after the last exposure.

*Cavnar* was based on ideas of fundamental fairness. "Since no statute controls the award of prejudgment interest in personal injury cases, the Cavnars must rely upon equitable considerations in order to prevail on their prejudgment interest claim." *Cavnar,* 696 S.W.2d at 552. The underlying policy supporting the assessment of prejudgment interest in *Cavnar* was intended to prevent abuses. "A potential award of prejudgment interest advances the objective of encouraging the speedy compensation to victims, and ensures that the aim of obtaining a high recovery for victims and their survivors is not defeated by a defendant's simple strategy of delaying payment or judgment until the award is diminished in actual value." *Id.* at 554. My question to the majority is, "How

[1]. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985).

can a defendant delay payment on something that neither he, the plaintiff, nor anyone else in the world knew existed?"

The duty of any defendant to pay money for prejudgment interest presupposes an obligation to pay, which in turn is derived from knowledge of the incident that gives rise to a plaintiff's injuries. It is ironic in this case, in order to defeat appellants' statute of limitations defense, certain appellees argued they were unaware that the substance, which the defendants produced, caused disease until years after any last exposure. Yet, the logic of appellants' prejudgment interest claim imputes knowledge to the defendants, that they produced a substance that was disease causing and scientifically unknown to them at the time of the occurrence of the incidents. The equitable goal of denying a generic defendant the use of money owed to an injured plaintiff is not achieved in the case because there is no proof to determine when the defendants should have been charged with knowledge that they had injured the plaintiffs.

Following is the statute preempting *Cavnar* and governing prejudgment interest, effective September 2, 1987:

> [P]rejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered.

TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6(a) (Vernon Supp.1993).

The Burts filed on March 22, 1985; the Frileys filed on January 27, 1986. At 566. I agree with the majority that because appellants' cases were filed before the effective date of the statute, they fall outside its governance. I disagree, however, that *Cavnar* dictates the majority conclusion that "prejudgment interest on past damages awards begins to accrue 'from a date six months after the occurrence of the incident giving rise to the cause of action.'" At 566 (quoting *Cavnar* at 555).

The majority applies *Cavnar* as if it were a statutory mandate. *Cavnar*, however, is based on notions of fundamental fairness and equity. Applying the majority's interpretation of *Cavnar* to the facts before us undermines the principals upon which *Cavnar* was founded.

We should be guided by the equitable principals of *Cavnar*, in combination with the equitable intent of the legislature in adopting article 5069–1.05, section 6(a), and the facts of the case before us. By doing so, we can affirm the trial court's calculation beginning six months after the filing of the suits, and thus avoid requiring a defendant to pay prejudgment interest for the period of time that neither he, the plaintiff, nor anyone else in the world had knowledge that an injury was occurring.