**Opinion issued January 15, 2015**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-14-00006-CV**

————————————

**CESAR CALDERON, Appellant**

**V.**

**HOME STATE COUNTY MUTUAL INSURANCE COMPANY, Appellee**

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-23234**

---

**MEMORANDUM OPINION**

After he was involved in a car accident, Cesar Calderon sued Home State

County Mutual Insurance Company to recover under his underinsured motorist

policy.  A jury awarded Calderon some of the medical expenses that he claimed to

have incurred following the accident, but it denied his request for past and future pain and mental anguish. Calderon contests the jury award of zero damages for pain and mental anguish as against the great weight and preponderance of the credible evidence. Finding no error, we affirm.

## Background

In November 2010, Christine Verhardt was driving along the Sam Houston Tollway, took her eyes off the road for four to five seconds, and rear-ended Cesar Calderon, who had stopped due to traffic congestion. Immediately after the accident, Calderon was dizzy and felt pain in his shoulder, neck, and legs. About 20 minutes later, he felt pain in his back, and had trouble standing. An ambulance transported him to the emergency department of Cypress Fairbanks Medical Center. The EMS report noted lower back pain with no abnormalities, and upper right leg pain. The damage to Calderon's car cost $3,610.92 to repair; the car was not totaled.

At the emergency center, technicians took x-rays of Calderon's neck, right shoulder, and right hip; all showed no fracture or dislocation. Calderon's neck x-ray showed "loss of normal cervical lordosis which may be secondary to position and/or muscle spasm" but found that "[o]therwise, the vertebral bodies and their appendages are normally aligned." Further examination showed no obvious abnormalities in his neck. Calderon continued to complain of back pain, decreased

2

spinal range of movement, and muscle spasms, but his spinal alignment remained normal. At the emergency center, no neurological deficits were noted. His symptoms improved markedly during his stay in the emergency center. Doctors diagnosed Calderon with back and neck pain and a bruised shoulder. Calderon was discharged later that evening with instructions to follow up with another doctor as needed.

In the days following the accident, Calderon began to seek treatment and had a chiropractic appointment with R. Pina. The chiropractor's exam and diagnosis showed decreased range of movement, muscle spasms, and sprains/strains in the shoulder, neck, and back. Calderon received physical therapy from Pina regularly for a few months after the accident.

A week after the accident, Calderon visited Dr. Vela in Corpus Christi. During his appointment, Calderon complained of pain in his neck, lower back, right shoulder, and right hip. Dr. Vela's exam showed restriction in Calderon's range of motion of his neck and muscle tenderness. Dr. Vela did not take any x-rays and did not view the x-rays already taken.

Calderon also visited R. Engelmohr, a chiropractor in Corpus Christi. There, Calderon complained of neck, back, chest, and jaw pain; a stiff neck, headache, tension, fatigue, and numbness in his toes. Dr. Engelmohr's exam showed that Calderon had neck pain and decreased range of motion in his spine. Engelmohr did

not take x-rays, and he diagnosed Calderon with muscle spasms and sprain/strain in the neck and back.

Calderon visited a radiology center for MRIs. The MRI of his right hip was negative. The MRI of his right shoulder showed tenosynovitis and impingement syndrome. An MRI of his neck showed small annular tears but with no disc protrusions or extrusions. An MRI of his lumbar spine was also taken, showing a protrusion at L5-S1 without extrusion or involvement of the nerve root.

After continuing with physical therapy and home exercises for several weeks, Calderon continued to have back pain, so he visited Dr. Dennis, an orthopedic surgeon in San Antonio. At the appointment, Calderon told Dr. Dennis that he had not had back or neck injury or symptoms before the accident. Calderon complained of back pain at a level of 8 out of 10, and numbness of the legs, especially the left leg. Dr. Dennis examined Calderon, noting tenderness and pain in his neck and back. Dr. Dennis conducted a neurological exam, but the results were negative. Dr. Dennis reviewed the MRIs of Calderon's back and neck, noting the small protrusions in his neck and protrusion between discs L5-S1. He recommended steroid shots for Calderon's back, and Calderon received shots on two occasions.

In July 2011, Calderon visited Dr. Rodriguez for a second opinion. Calderon again complained of back pain and pain radiating to his left leg. Dr.

Rodriguez diagnosed a herniated lumbar disc and radiculopathy, without taking new x-rays or MRIs, despite earlier MRIs showing no herniated discs. He recommended back surgery.

Calderon returned to Dr. Dennis in April 2012, complaining that he had lower back and leg pain and that his leg often fell asleep, despite receiving steroid shots. Dr. Dennis conducted a neurological exam on Calderon, and the results were again negative. Dr. Dennis requested that Calderon receive a discogram test to make sure that he was a candidate for back surgery.

In February 2013, Calderon again saw Dr. Dennis with the same complaints. Calderon had not received a discogram before this appointment, but ranked his pain at 8 on a 10–point. Dr. Dennis again requested that Calderon receive a discogram test to determine whether he was a candidate for back surgery. He testified that it was essential to have a positive discogram result before performing back surgery and that a positive discogram at the L5-S1 disc would indicate that L5-S1 was the cause of Calderon's pain. Dr. Dennis focused on L5-S1 because of the results of Calderon's MRI.

In June 2013, shortly before trial, Calderon received a discogram test. During the discogram, Calderon reported no pain at L5-S1. Calderon reported pain at different discs in the lower back. He also received a CT scan of his spine, the first scan since his MRI in 2010. The scan of "L5-S1 showed severe degenerative

discogenic disease with annular tears" and "large marginal bone spurs . . . causing mild central spinal canal stenosis and left-sided neuroforaminal narrowing." The scan showed degenerative discogenic disease. Calderon agreed that the results seemed different from the MRIs taken in 2010.

By the time of trial, Calderon's lower back and hip pain remained. His shoulder and neck were fully improved after his treatment. Calderon testified that he did not take prescribed pain killers because they negatively affected his performance at work. Calderon testified to changes in his lifestyle after the accident, stating that his pain affects the long distances he must drive for work, that he can no longer ride his bike daily or complete rides for cancer awareness, and that he can no longer play golf for work or recreation. He testified that he has delayed scheduling surgery because of his work schedule.

*Expert Testimony*

At trial, the experts sharply disputed Calderon's medical condition and the MRI test results. Based on the MRIs taken a week after the car accident, Dr. Dennis, expert for the plaintiff, testified that the MRI of the lower back at disc L5-S1 revealed a "relatively good result" and that the protrusion at L5-S1 did not affect the nerve. But Dr. Dennis opined that Calderon's pain stemmed from the car accident. He noted that the type of numbness and tingling that Calderon reported would be painful to an individual. On cross-examination, Dr. Dennis admitted that

6

due to Calderon's negative neurological exams, there was no objective verification for Calderon's complaints of pain.

Dr. Bloom, an expert for the defense, reviewed the medical records and MRIs taken a week after the accident. Dr. Bloom observed the disc protrusion at L5-S1, but like Dr. Dennis, noted no neural compression caused by it. He opined that a protrusion not impinging on the nerve would not cause harm. He explained that disc degeneration is a disc dehydration process that occurs with aging; in his opinion, Calderon had some disc degeneration at the L1-2 and L5-S1 discs due to the normal aging process.

When viewing the MRI of Calderon's neck, Dr. Bloom did not observe the annular tears noted by the radiologist, but testified that annular tears are associated with degenerative disc disease. In his opinion, the degenerated discs, extending from the C2-3 through C6-7 level, resulted from ordinary degeneration. Dr. Bloom concluded that the MRIs did not show problems attributable to or aggravated by the accident; instead, he found evidence of degenerative disease of the cervical and lumbar discs.

Dr. Bloom found that the MRI of the right hip was normal. After viewing the MRI of Calderon's right shoulder, he only found some arthritic changes with no indication that the accident had affected the shoulder.

Dr. Bloom also testified about the exams performed by other doctors. He confirmed the neurological exams conducted by Dr. Dennis and Engelmohr showed no abnormal neurological findings. Dr. Bloom also observed that Calderon's medical records from March 2011 onward showed that Calderon's medical problems changed over time. Records from Dr. Rodriguez, taken eight months after the accident, indicate pain radiating down the leg and neurological deficit. Dr. Pina's records indicated Calderon had numbness in his right leg after the accident, but later Calderon developed left leg symptoms. Dr. Bloom testified that Calderon's "symptoms ha[d] changed and [he] developed an abnormal neurological examination which is not explainable by the initial MRI."

*Course of Proceedings*

Calderon sued Christine Verhardt, Travelers Indemnity Company, and Home State County Mutual Insurance Company. Calderon had insurance coverage with Home State and sought to recover under his uninsured or underinsured motorist coverage. Verhardt settled the claim against her; Home State was the remaining defendant at the time of trial. The jury awarded damages of $19,005 for medical care expenses incurred in the past, but declined to award Calderon any damages for future medical expenses or for pain and mental anguish. Calderon moved for a new trial, arguing that the jury's verdict of zero damages for pain and

suffering was against the great weight and preponderance of the evidence. The trial court denied the motion.

## Discussion

Calderon contends that we should reverse and remand for a new trial because the jury's refusal to award pain and suffering damages is against the great weight of the evidence, especially given its award for medical expenses.

*Standard of Review*

When a party attempts to attack the factual sufficiency of an adverse finding on an issue on which he has the burden of proof, he "must show that the adverse finding is against the great weight and preponderance of the evidence." *Urista v. Bed, Bath, & Beyond, Inc.*, 245 S.W.3d 591, 601 (Tex. App.—Houston [1st Dist.] 2007) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001)). We will set aside a verdict only if the evidence is so weak that the finding is clearly wrong and unjust. *Id.* In doing so, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Id.* (quoting *Dow Chem. Co.*, 46 S.W.3d at 242).

The jury is the sole judge of the credibility of the witnesses and the weight of their testimony. *Id.* The jury may believe one witness and disbelieve another and resolve inconsistencies in any testimony. *Id.*; *see also Figueroa v. Davis*, 318

S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2010) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 819–20 (Tex. 2005)). We should not substitute our opinion for that of the jury or determine that we would have weighed the evidence differently or reached a different conclusion. *Urista*, 245 S.W.3d at 601.

*Analysis*

"[T]he process of awarding damages in a personal injury case for amorphous, discretionary injuries such as pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, non–pecuniary loss." *Moore v. State Farm Mut. Auto. Ins. Co.*, No. 01-09-00657-CV, 2010 WL 2220878, at *3 (Tex. App.—Houston [1st Dist.] June 3, 2010, no pet.) (mem. op.) (citing *Dollison v. Hayes*, 79 S.W.3d 246, 249 (Tex.App—Texarkana 2002, no pet.)). It is particularly within the province of the jury to set the amount of damages for pain and suffering. *Hicks v. Ricardo*, 834 S.W.2d 587, 591 (Tex. App.—Houston [1st Dist.] 1992, no writ); *see also Moore*, 2010 WL 2220878, at *3.

In some cases, the injuries have objective manifestations that plainly support some award for pain and suffering. *Moore*, 2010 WL 2220878, at *4 (citing *Dollison*, 79 S.W.3d at 249–50). In cases with these sorts of objective physical manifestations, a jury's failure to award damages for pain and suffering, while simultaneously awarding medical expenses, is error. *Id.* (citing *Dollison*, 79

S.W.3d at 250). For example, objectively verifiable injuries like bone fractures, nerve damage, burns, lacerations, torn muscles, and concussions have been held to support an award of pain and suffering. *Id.* (citing *Dollison*, 79 S.W.3d at 250 n.1).

But in other cases, where the objective indicia of injury are less obvious or entirely absent, a jury may disregard purely subjective complaints that are necessarily speculative and incapable of direct proof. *Id.* (citing *Srite v. Owens-Illinois, Inc.,* 870 S.W.2d 556, 559 (Tex.App.—Houston [1st Dist.] 1993), *rev'd on other grounds, Owens-Illinois, Inc. v. Burt,* 897 S.W.2d 765, 769 (Tex. 1995); *see Blizzard v. Nationwide Mut. Fire Ins. Co.,* 756 S .W.2d 801, 805 (Tex. App.— Dallas 1988, no writ) (jury finding of no damages for pain and suffering not improper when indicia of injury and damages almost entirely subjective)).

Calderon argues this case falls within the former category, requiring an award for pain. He points to his own testimony, as well as that of Dr. Dennis and Dr. Bloom, and his medical records introduced at trial. The testimony that Calderon relies upon, however, is based on subjective complaints of pain. Tests performed immediately after the accident did not show objective signs of pain. Dr. Dennis performed a neurological exam, and it was negative. Calderon's own expert, Dr. Dennis, testified that he had no objective verification for Calderon's complaints of pain. In light of all the evidence, the jury reasonably could have

concluded that Calderon's ongoing complaints of pain were not proximately caused by the accident and did not rise to the level of compensable pain and suffering. *See Moore*, 2010 WL 2220878, at *3–4.

In particular, Dr. Bloom testified that the neck and lower back results were symptoms of disc degeneration that occurs over time with aging, and that the lower back protrusion would not cause pain. Dr. Dennis agreed that the lower back MRI showed a relatively good result and that the nerves were not affected. The jury is given great discretion in setting physical pain and mental anguish damages. *See Hicks*, 834 S.W.2d at 591.

Calderon notes that Dr. Rodriguez diagnosed Calderon with a herniated disc and radiculopathy, which objectively would cause back pain. The defense expert discounted Dr. Rodriguez's assessment because it occurred over eight months after the accident, and the objective tests that occurred immediately after the accident did not support it. Dr. Bloom testified that Dr. Rodriguez's abnormal neurological examination was not explainable by the initial MRI.

As with the disputed expert testimony, Calderon's testimony about his pain was challenged at trial. While he testified to ongoing, significant pain caused by the accident, other evidence weighed against Calderon's credibility. The damage to his car was relatively minor; he had repair costs of approximately $3,600. Though he lives in Houston and the accident occurred in Houston, he traveled to

Corpus Christi and San Antonio for treatment. Although the jury could have believed that Calderon suffered from back and neck pain, they also could have concluded, based on the disputed evidence, that Calderon failed to show that his ongoing debilitating pain was due to the car accident. The jury reasonably could have determined that Calderon's later symptoms were attributed to a degenerative condition and not the car accident. *See Urista*, 245 S.W.3d at 601. Because the evidence conflicted at trial, with some evidence challenging any award for pain, it was within the jury's province to decline to award damages for physical pain and mental anguish. *See id.*

## Conclusion

We hold that the jury's verdict of zero damages for pain and mental anguish is not against the great weight and preponderance of the evidence. We therefore affirm the judgment of the trial court.

Jane Bland
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.

13